COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-214-CV

 

 

IN THE INTEREST OF Z.D.G. 

AKA Z.D.S., A
CHILD                                                                                            

 

                                                                                                                             

 

                                                       ------------

 

              FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I. 
Introduction

In twelve
issues, Appellant Father appeals the termination of his parental rights to
Z.D.G., challenging the legal and factual sufficiency of the evidence to
support the jury=s endangerment and best interest
findings.[2]  We affirm.

 

II. 
Termination of Parental Rights








Father
complains that the evidence is legally and factually insufficient to support
termination of his parental rights under subsections (D) or (E) of family code
section 161.001(1)[3]
and to support the best interest finding under section 161.001(2).  See Tex. Fam. Code Ann. ' 161.001(1)(D),
(E), (2) (Vernon Supp. 2009).

A.  Standard of Review

In a
termination case, the State seeks not just to limit parental rights but to
erase them permanentlyCto divest the parent and child of
all legal rights, privileges, duties, and powers normally existing between
them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).








In
proceedings to terminate the parent‑child relationship brought under
section 161.001 of the family code, the petitioner must establish one ground
listed under subsection (1) of the statute and must also prove that termination
is in the best interest of the child. 
Tex. Fam. Code Ann. ' 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination
may not be based solely on the best interest of the child as determined by the
trier of fact.  Tex. Dep=t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. '' 161.001,
161.206(a) (Vernon 2008). Evidence is clear and convincing if it Awill
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.@ Id.
' 101.007
(Vernon 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).

1.  Legal Sufficiency








In
reviewing the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were
proven.  In re J.P.B., 180 S.W.3d
570, 573 (Tex. 2005).  We must review all
the evidence in the light most favorable to the finding and judgment. Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.
We must also disregard all evidence that a reasonable factfinder could have
disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable factfinder could and
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We must
therefore consider all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
factfinder=s province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.

2.  Factual Sufficiency

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder=s findings and not
supplant the verdict with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006). 
We must determine whether, on the entire record, a factfinder could
reasonably form a firm conviction or belief that the parent violated
subsections (D) or (E) of section 161.001(1) and that the termination of the
parent-child relationship would be in the best interest of the child.  Tex. Fam. Code Ann. ' 161.001;
In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108. 

B.  Endangerment








Section
161.001(1)(D) requires a finding that the parent knowingly placed or knowingly
allowed the child to remain in conditions or surroundings that endanger the
physical or emotional well‑being of the child.  Tex. Fam. Code Ann. '
161.001(1)(D).  Section 161.001(1)(E)
requires a finding that the parent engaged in conduct or knowingly placed the
child with persons who engaged in conduct that endangers the physical or
emotional well‑being of the child. 
Id. ' 161.001(1)(E).  








Endangerment
is defined as exposing to loss or injury, to jeopardize.  In re J.T.G., 121 S.W.3d 117, 125
(Tex. App.CFort Worth 2003, no pet.).  Under subsection (D), it is necessary to
examine evidence related to the environment of the child to determine if the
environment was the source of endangerment to the child=s
physical or emotional well‑being.  In
re D.T., 34 S.W.3d 625, 632 (Tex. App.CFort
Worth 2000, pet. denied).  A child is
endangered when the environment creates a potential for danger that the parent
is aware of but disregards.  See In re
S.M.L., 171 S.W.3d 472, 477 (Tex. App.CHouston
[14th Dist.] 2005, no pet.). 
Inappropriate, abusive, or unlawful conduct by persons who live in the
child=s home or
with whom the child is compelled to associate on a regular basis in his home is
a part of the Aconditions or surroundings@ of the
child=s home
under section 161.001(1)(D). Castorena v. Tex. Dep=t of
Protective & Regulatory Servs., No. 03‑02‑00653‑CV,
2004 WL 903906, at *8 (Tex. App.CAustin
Apr. 29, 2004, no pet.) (mem. op.); see also In re W.S., 899 S.W.2d 772,
776 (Tex. App.CFort Worth 1995, no writ)
(stating that Aenvironment@ refers
not only to the acceptability of living conditions, but also to a parent=s conduct
in the home).

Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child=s physical or emotional well‑being
was the direct result of the parent=s
conduct, including acts, omissions, and failures to act. J.T.G., 121
S.W.3d at 125.  Termination under
subsection (E) must be based on more than a single act or omission; a
voluntary, deliberate, and conscious course of conduct by the parent is
required.  Id.; D.T., 34
S.W.3d at 634.








To
determine whether termination is necessary, courts may look to parental conduct
occurring both before and after the child=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).  The factfinder may infer from past conduct
endangering the child=s well‑being that similar
conduct will recur if the child is returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 267 n.39, and C.H., 89
S.W.3d at 26.   Drug abuse during
pregnancy constitutes conduct that endangers a child=s
physical and emotional well‑being. 
See In re W.A.B., 979 S.W.2d 804, 806B07 (Tex.
App.CHouston
[14th Dist.] 1998, pet. denied), disapproved of on other grounds, J.F.C.,
96 S.W.3d at 267 n.39; Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).  And Aa parent=s use of
narcotics and its effect on his or her ability to parent may qualify as an
endangering course of conduct.@  In re J.O.A., 283 S.W.3d 336, 345
& n.4 (Tex. 2009); see also In re S.K.A., No. 10-08-00347-CV, 2009
WL 2645027, at *9 (Tex. App.CWaco Aug.
19, 2009, no pet.) (mem. op.) (holding that father=s failure
to take any action to protect unborn child from mother=s drug
use was sufficient to establish that he knowingly allowed the child to remain
in conditions and surroundings that endangered the child=s
physical well-being); In re M.J.M.L., 31 S.W.3d 347, 351B52 (Tex.
App.CSan Antonio
2000, pet. denied) (holding that evidence of course-of-conduct endangerment was
legally sufficient when it showed that father knew mother was a drug addict who
used drugs while pregnant and that he abandoned soon-to-be-born baby to her
care); Edwards v. Tex. Dep=t of
Protective & Regulatory Servs., 946 S.W.2d 130, 138 (Tex. App.CEl Paso
1997, no writ) (holding that father=s failure
to take any action to protect the child from mother=s drug
abuse while pregnant was sufficient to establish that he knowingly allowed the
child to remain in an endangering environment), disapproved of on other
grounds, J.F.C., 96 S.W.3d at 267 n.39. 
To support a finding of endangerment, the parent=s conduct
does not necessarily have to be directed at the child, nor is the child
required to suffer injury.  Boyd,
727 S.W.2d at 533.

1.  Evidence

a.  Z.D.G.=s Removal
History








Mother,
whose history with Child Protective Services (ACPS@)
involving her older two children began in 2006 and is set out in greater detail
below, tested positive for cocaine fifteen days before Z.D.G. was born on May
15, 2007.[4]  The Department of Family and Protective
Services (ADFPS@) filed a
petition for Z.D.G.=s protection, removed Z.D.G. at
the hospital, and placed her into foster care. 
CPS worker April Cumberbatch was initially assigned to the case and
transferred it to Katrina Lewis in August or September 2007. Terry Slife,
Z.D.G.=s
court-appointed special advocate (ACASA@), was
appointed to the case in August 2007.








On July
20, 2007, the trial court signed an order returning possession of Z.D.G. to
Mother and Father,[5]
ordering Mother to submit to random drug testing and quarterly hair follicle testing,
ordering Father to sign a release to DFPS and CPS for Tarrant County Probation
Department=s Urine Analysis results,[6]
and ordering both parents to allow DFPS and CPS access to Z.D.G.  By January 30, 2008, DFPS had filed a motion
to dismiss, having decided that Aif
everything was still going according to plan, [and] the mom was still testing
negative, that [DFPS] would [close the case].@

But less
than a week later, DFPS filed an emergency motion to modify possessory
conservatorship, alleging an immediate danger to Z.D.G.=s
physical health or safety because Mother=s January
29, 2008 hair follicle tested positive for cocaine.  Neil Fortner, a toxicologist, testified that
hair follicle testing shows drug usage going back around ninety daysCso from
October 2007 to January 2008 for the January 29, 2008 testCand that
the amount of cocaine that Mother=s hair
sample contained was relatively high at three times the amount needed to result
in a positive test.[7]  The trial court granted DFPS=s motion,
returned Z.D.G. to foster care, and gave Mother and Father supervised
visitation with her at the CPS office for one hour a week.

On April
17, 2008, the trial court issued an order returning possession of Z.D.G. to
Father and granting Mother reasonable supervised visits Aas agreed
upon by [DFPS].@ 
Lewis testified that Father said Athat he
would comply with CPS requests that [Mother] have no unsupervised contact with
[Z.D.G.]Cthat the
contact would be supervised by CPS.@








On May
28, 2008, DFPS filed another emergency motion to modify possessory conservatorship,
alleging an immediate danger to Z.D.G.=s
physical health or safety because of a May 24, 2008 disturbance involving
Mother and Mother=s mother (AGrandmother@) at
which Z.D.G. was present.  Hurst Police
Officer Brianne Dibley, who responded to the call, testified that when she
spoke with Mother, Mother was clearly under the influence of drugs, that Mother
admitted to having used methamphetamine for about a week and a half, and that
Mother said Grandmother had bought the drugs.[8]  Mother retrieved her drug pipe from the
apartment floor and handed it to Officer Dibley, and there were signs of a
domestic dispute, including broken glass, at Grandmother=s
apartment.  Officer Dibley obtained
Father=s contact
information from Mother and called him to pick up Z.D.G.  The trial court granted DFPS=s motion,
and Z.D.G. was returned to foster care again.








On August
15, 2008, Father filed a motion for monitored return of Z.D.G. On September 26,
2008, the trial court granted his motion and returned Z.D.G. to his
possession.  However, in its order, the
trial court specifically stated, AIT IS
ORDERED that Respondent Mother, . . . shall have supervised visitation and
access to the child, . . . arranged and supervised by the Managing Conservator
[DFPS].  IT IS ORDERED that [Father]
shall not allow any contact between the child and the Respondent Mother[.]@  [Emphasis added.]  Lewis testified that she talked with Father
about this order and he stated that he understood. Mother=s
September 2008 drug test was positive for methamphetamine, and Mother admitted
to Slife that she had relapsed badly. 

On
January 28, 2009, DFPS filed another emergency motion to modify possessory
conservatorship because Mother had been providing childcare for Z.D.G. while
Father workedCin violation of the trial court=s orderCand
Father had no electricity in his apartment and was being evicted from it.  By the February 3, 2009 motion hearing,
Father had been evicted and he and Z.D.G. had moved into a Budget Suites
hotel.  The trial court granted the
motion and Z.D.G. returned to foster care again, where she remained at the time
the termination trial began in May 2009. 
The trial court also ordered Father to participate in a hair follicle
and a urine sample drug screening. 
Father complied with the urinalysisCwhich was
negative for drugsCbut he did not have enough hair
on his head or body for the hair follicle test.

The trial
court removed Father as temporary possessory conservator at the February 3,
2009 hearing, and he and Mother were to resume supervised visits at the CPS
office.  Mother visited inconsistently;
by the time trial started on May 18, Father had not visited Z.D.G. since March
30.[9]

b.  Mother=s History









Although
Mother does not appeal the termination of her parental rights to Z.D.G.Cshe
signed a voluntary affidavit of relinquishment and the trial court found
termination to be in Z.D.G.=s best
interestCwe must
review the evidence pertaining to her because Father placed or allowed Z.D.G.
to remain with her.    Sheri Maples had
been the CPS worker assigned to a case involving Mother=s two
older children, R. and P.[10]  Maples testified that in May 2006, DFPS
received a report alleging that Mother and her paramour had been using
methamphetamine in front of R.  Mother
was pregnant with P. at the time. After Mother gave birth to P., both children
went into foster care, and Mother, P.=s father,
and R=s father
were given service plans.  P.=s father
relinquished his rights to P.; R.=s father
did not complete any of his service plan.








Maples
testified that Mother completed parenting classes and a psychological
evaluation but that she did not attend a lot of visits with the children, and
when she did, she did not always behave appropriately.[11]  Mother was arrested twice at the CPS office
because she had outstanding warrants.     Maples
testified that Mother would frequently refuse to take urinalysis drug testing
and that A[u]sually, [she] . . . was caught
through hair strand testing.@  R.=s father Awould end
up in jail or they were fighting. There was a lot of domestic violence between
the parents.@ 
Sometimes R.=s father would refuse drug
testing, sometimes he would fail to appear for the tests, and Aone time,
he . . . shaved all his body hair from the head all the way down, because . . .
he was told that we were going to do the hair strand, so he shaved everywhere,
and so when they went for the testing, they were not able to test him.@

In
October 2006, while her other two children were in foster care, Mother admitted
to Maples that she was pregnant with Z.D.G. and that, if drug tested, she would
test positive for methamphetamine and marijuana.  Mother was living with Father at the
time.  Maples testified that, based on
Mother=s two
drug tests in November 2006, she was concerned that Mother was continuing to
use methamphetamine.  Mother=s January
2007 psychological evaluation included predictions that Mother was at high risk
for continued drug use in the future and that small children in her care would
be at high risk for abuse and neglect; it also noted that her responses
suggested that she had longstanding psychological and substance abuse issues.

Mother
lived with Father for around five months before she went into inpatient drug
treatment in February 2007.  She did not
successfully complete the program and left treatment in March 2007.  The trial court accepted her voluntary
relinquishment of her parental rights to R. and P. in April 2007. Z.D.G. was
born in May 2007.








Lewis
testified that after Z.D.G.=s January
2008 removal, Mother told her that she and Father were separating and that she
was moving in with Grandmother so that Father would be able to get custody of
Z.D.G.  During this transitional period,
on March 18, 2008, Arlington Police Corporal James Greenwell responded to a
domestic disturbance at Father=s
apartment.  Father reported that Mother
assaulted him when she was moving some of her belongings.  She left several long scratches on his
forearm but left before the police arrived. 
Mother told Lewis that she and Father Ahad
gotten into an altercation, that he pushed her in the chest, but that he didn=t leave a
mark, and [that] he knew how to do it where he didn=t leave a
mark.@  Slife testified that Mother claimed Father
pushed or shoved her in the chest and that she knew Mother had scratched Father
badly because she saw the scratches. 

During
Mother=s May 24,
2008 encounter with Officer Dibley, the officer noticed that a vase had been
knocked over and a picture frame had been shattered.  Mother told her that the picture frame fell
when she went to her room and slammed the door and that Grandmother picked it
up and threw it at the door, shattering it. 
Officer Dibley testified that methamphetamine users can be very
irrational and get very upset very quickly. 








Slife
testified that Mother told her that Father had been bringing Z.D.G. over on the
weekends and that Father admitted to her that he had taken Z.D.G. to Mother=s on
numerous occasions.  Lewis testified that
after the May 24, 2008 incident, Mother told her that Father had been bringing
Z.D.G. to her every weekend and that Ashe
couldn=t turn
her child away on that particular day@ because
Z.D.G. was sick.  Mother had taken Z.D.G.
to the doctor earlier that day and provided Lewis with the bill for x-rays
because she needed CPS to pay it.  Mother=s contact
with Z.D.G., unsupervised by CPS, was a violation of the court=s April
17, 2008 order.

Slife
testified that she often spoke with Mother on the phone about attending
Narcotics Anonymous and counseling, drove Mother to visits with Z.D.G. four or
five times, and offered to drive her to rehab. 
Slife said that she noticed when Mother was manic and Avery up
and down,@ but she did not see some of the
other symptoms associated with cocaine or methamphetamine use.

Mother
tested positive for methamphetamine and amphetamine via hair follicle testing
and urine testing in September 2008.  By
March 2009, Mother was again encouraged to undergo inpatient drug treatment,
but she did not go, and by trial in May 2009, Mother was pregnant again,
although according to what Mother told Slife, this child was not Father=s.

Mother
signed an irrevocable affidavit of relinquishment of her parental rights to
Z.D.G. before the termination trial. 
Lewis testified that she believed Mother=s conduct
had endangered Z.D.G. and that Father=s
allowing Mother ongoing access to Z.D.G. had endangered her, and she asked the
trial court to terminate both parents= rights
to Z.D.G.  Slife also recommended
terminating both parents= rights to Z.D.G.

c.  Father=s
History, Acts, and Omissions








Father=s trial
testimony pertaining to when he learned of Mother=s drug
problem is inconsistentCduring his direct testimony, he
stated that he started getting suspicious that Mother had a bad drug problem
when he Awent to
go take [Z.D.G.] home from the hospital,@ and that
he did not know before the day Z.D.G. was born that Mother had a drug
problem.  However, during
cross-examination, he testified that he became aware that Mother had a drug
problem while she was pregnant with Z.D.G. because he visited her at the
inpatient drug treatment center during that time.

Father
was very angry about the February 2008 removal and told Slife that Mother must
have been using drugs with Grandmother. 
Although he told Slife that Mother would never be high around the baby,
Slife said that even before Mother=s January
29, 2008 positive hair follicle drug test, she spent a lot of time talking with
both parents about Narcotics Anonymous. 
She stated, A[Father] understood [Mother]
needed to go.@ 
Slife also testified that she spoke with Father often about Mother=s drug
levels and drug use.








Slife
testified that on March 12, 2008, when she explained to Father that Mother=s drug
tests were not only high, but higher than they previously had been, Ahe stated
he had a suspicion that [Mother] was using; he just didn=t
confront her about it.@ 
Slife stated that Father always claimed that Mother Awas a
good Mom,@ and Father testified that he had
only asked Mother about her two older children Ain
passing.@  He acknowledged that, in hindsight, he should
have asked her to give him some details about why those children were in foster
care but said that she presented her story to him as Ait wasn=t her
fault, it was pretty much her boyfriend=s fault,
and [he] left it at that@ because it was something he Areally
didn=t care
about.@[12]

Slife
testified that Father consistently failed to understand why it was dangerous
for him to allow Mother access to Z.D.G. 
When Z.D.G. was returned to Father in April 2008, the trial court
specifically ordered that Mother could see Z.D.G. only during supervised visits
at the CPS office.  On April 22, 2008,
Father told Slife that he did not understand why Mother=s visits
had to be supervised because he thought she was a good mom; Ashe would
never, never use around the baby.@  Father testified that he had never wanted
Mother to be supervised with Z.D.G.








When
Z.D.G. was returned to Father in April 2008, he asked CPS for help paying for
daycare.  Although no subsidized daycare
could be guaranteed, CPS was able to provide payment for weekday daycare for
Father from April 23, 2008, until her removal on May 28, 2008.  Father testified that he did not use Mother
and Grandmother for weekend daycare but that his family worked on the weekends,
so he Ahad
various friends, personal friends that [he] would let watch [Z.D.G.]@CDoug, John,
and Raymond.[13]  Contrary to this testimony, however, he also
stated that with regard to the May 24, 2008 incident, he had given Z.D.G. to
Grandmother for Z.D.G.=s birthday because he had to work
that weekend and Grandmother told him that Mother was out of town.[14]  In contrast to Slife=s
testimony that he told her in February 2008 that Mother must have been using
drugs with Grandmother, Father testified at trial that prior to May 24, he Ahad no
idea whatsoever@ that Grandmother may have been
using drugs.

Slife
stated that after the May 24 incident, Father Awas
extremely angry that [Z.D.G.] had been removed from day care at CPS and he told
me he didn=t know [Mother] had been using
again and therefore he wasn=t
neglectful.@ Slife said that she specified to
Father that he was putting Z.D.G. in danger with Mother, but that in September
2008, Father again asked her if Grandmother could watch Z.D.G. and if Mother
could have access to Z.D.G. at that timeCSlife
told him no.

When
Z.D.G. was returned to Father in September 2008, CPS resumed paying for
daycare; at that time, Father was employed in building the new Cowboys
stadium.  By January 2009, the subsidized
daycare had expired.[15]
Father testified that he knew he had disobeyed the court=s order
by letting Mother have access to Z.D.G. in January 2009, but he felt he had no
choice Abut to do
that or lose [his] job@ when he discovered that his
subsidized daycare had been cancelled. 
However, Slife testified that in September and October 2008, she and
Father talked numerous times about how he could apply for the subsidized daycare
on his own.








Although
in November 2008, Father told Slife that Mother would always be part of Z.D.G.=s life
but never as a caregiver, by February 2009, Z.D.G. was removed again because
Father had been allowing Mother to take care of Z.D.G. Father acknowledged that
Mother=s
watching Z.D.G. was Anot really@ in
Z.D.G.=s best
interest, but he also stated, AI think
it was in her best interest for [Mother] to watch her at my place and not at
[Mother=s]
apartment.@ 
He stated that he had given Mother specific instructions that day to
stay at his apartment Abecause knowing in the light that
[Mother] takes her to the apartment that [Mother=s] more
prone to maybe falling or doing something not correct, you know, doing
something stupid [like] . . . drugs.@  He testified that Mother had to follow his
instructions Aso we don=t get
busted.@

Mother
admitted to Slife in early January 2009 that she had been watching Z.D.G. for
Father again.  On January 26, 2009,
Mother called Slife:  AShe was
hysterical, and she was screaming that [Father] was being evicted, he didn=t have
any electricity in his home, and she was worried about him watching [Z.D.G.]
with no electricity, so she had watched her.@

Father
testified that on a parenting scale of one-to-ten, Mother would be an eight for
Z.D.G., describing her as follows,








When she was living with me and when I was working both jobs, . . . the
way she took care of her daughter was that ofCthat I=ve actually never seen
with both my other moms.  She would
always have a bottle ready for her.  When
she woke up, [Mother] would walk with her until she fell asleep, she would rock
her to sleep, she would play with her, she would do normal things that a mom, I
think she would go above and beyond what a mom would do.  And that=s just from a dad=s point of view. . .
.  Just the two from the ten being the
part she=s on drugs would be the
bad, would be the two minus her being a ten. 
[Emphasis added.]

 

On cross-examination, he gave the
following testimony:

Q.  Okay.  How many times doesCin your mindCdoes [Mother] need to test
positive for drugs, assault you, have the police go to her home and find drug
paraphernalia there?  How many times does
that have to happen before you decide this is not someone that I should allow
my child to be with?

I=m looking for a number, not an explanation.

 

A.  I guess a number probably should be number
one.

Father
testified that he only once knowingly violated the trial court=s order
with regard to Mother=s access to Z.D.G., in January
2009.  Slife stated that she knew of no
incidents, other than on May 24, of Mother=s having
possession of Z.D.G. while under the influence of drugs.  Slife testified that Father had stated to her
that, in his opinion, letting Mother have access to Z.D.G. was in Z.D.G.=s best
interest.








Father
also had his own drug history.  He was on
deferred adjudication community supervision for a 2003 possession of a
controlled substance offense.[16]  At trial, he testified that the last time he
used an illegal drug was cocaine on the date of his arrest in 2003.  However, the jury also heard that he had
previously testified at the September 17, 2008 hearing that the last time he
used cocaine was in the 1990s.  Father
presented a certificate of completion of supportive outpatient treatment for
drugs dated June 28, 2006, to show compliance with his community supervision.

Most of
the testimony at trial indicated that Father consistently refused to take drug
tests requested by CPS.  Father did not
complete any drug tests for CPS between May 28, 2008, and January 2009.  Father=s
continued objection to submitting to drug testing at CPS=s request
was that it was not court-ordered and therefore violated his right to privacy.[17]








Father
testified that he did not have time to go take a drug test every time a CPS
worker asked him to and that the first judge in the case ordered his drug tests
to be obtained from his probation officer. 
Cumberbatch testified that, in the beginning, Father did not want to
sign the release of information about his drug tests from his probation
officer.  She testified that she never
actually saw Father=s drug tests but just Atook the
probation officer=s word for it.@  Lewis testified that all the probation
officer would give her was the results of the tests, but she acknowledged that
there was no evidence of Father=s using
illegal drugs since DFPS filed the case.

Slife
testified that Mother told her that Father Awas able
to beat his probation-ordered [urinalysis tests] by not going in as soon as he
was called by the [probation] officer.@[18]  Father testified that he did not know how one
would fake a drug test and that he never told Mother that he knew how to do
that. He also testified that when his probation officer tells him to take a
drug test, he has twenty-four hours to go take the test if the request is made
after 3 p.m., and that if it is before 3 p.m., he is supposed to go take it
right then.  He added, AWell,
usually, I take time off from work to go see my probation officer, and if she
tells me to go take a test, which usually she does, there are times she doesn=t, but I=ll take
that time, because I don=t have time to take off from
work, and I=ll go right after.@  He also testified that he knows a month in
advance when his next meeting with his probation officer will occur because she
does all of the scheduling, and that of the urinalysis drug tests he has been
given over the five years of probation, only six or seven tests were totally
random.








Fortner
testified that any hair can be used for a hair follicle test, as can
fingernails, but that body hair, including facial hair, grows much slower than
head hair, so the window for estimating drug use expands from ninety days to up
to a year.  Father testified that he had
been shaving his head since 1999 and started shaving his body hair a few years
after that when he started training; he shaves his head because he is
balding.  He attributed his fingernail
and toenail trimming to staying Awell-groomed,@ and he
stated, AAbsolutely
not,@ when
asked whether he had been shaving in an attempt to avoid drug tests. Fortner
opined that if Father had quit shaving his head on February 3, 2009, he would
have been able to complete a hair follicle test by the start of trial on May
19, 2009.[19]  Father testified that after Z.D.G.=s final
removal in January 2009, he Areassured
[Lewis] and asked her to give [him] a drug test every week, every day, [to]
which she said no, she wouldn=t do that
because [he] would be prepared for it or something like that.@ 








Father=s May 25,
2007 urine test was admittedCit showed
a positive result for hydrocodone, a semi-synthetic prescription narcotic
synthesized from codeine.  However,
Fortner testified that Father=s
hydrocodone level was not elevated to any extent that he would consider a form
of abuse, as opposed to Mother=s drug
levels, which were Aextremely high.@  Father testified that he was taking
hydrocodone at the time for a groin injury that he had surgery for. Slife
testified that Mother told her in August 2008 that Father was trying to get
hydrocodone from her, and that the first she had heard about Father having a
prescription for hydrocodone was in January 2009.

Father=s
attempted hair follicle drug test from June 2007 was admitted. It reflects that
Father did not have any fingernails, toenails, or hair on his head or body that
could be cut to send off for a lab test, so the test could not be performed.  The representative from the testing company
stated that if a person says he has no body hair, A[w]e can=t just
take their word for it.  We have to pull
them in the back room and see for ourselves.@[20]  Father testified that he was A[a]bsolutely
not@ taking
drugs at the time.








Generally,
Father was uncooperative in his dealings with CPS. Cumberbatch testified that
Father did not want to allow CPS access to Z.D.G., that his physical behavior
was very intimidating, and that he was insulting, tried to provoke arguments,
and used profanity.  Slife testified that
Father was sometimes verbally abusive to her and to the CPS workerCAhe would
yell very, very loudly, he would get in your face, he would curse
occasionally.  There was a time I felt
intimidated by him at the visit, and at the next visit, he and I talked about
that.@[21]  She also testified about an incident on
September 23, 2008, when

I was having trouble figuring out where [Z.D.G.] was in day care, and
it was very important for me to figure out if she was with [Mother] or in day
care, so I called [Father] and asked him where she was going, and he wouldn=t give me that
information.  I asked him repeatedly for
the information, and he asked me did I have a pen and paper, and I said yes, I=m ready to write the name
down, and he said, well, then I have 25 names for you to figure that out. What
I=m going to do is send her
to a different person every day, and every day you can just call one of these
25 people and figure out where she is.

 

He never gave her the twenty-five
names.








At some
point, Mother expressed to Lewis that she was afraid of Father, that he used
more drugs than she did, and that he had threatened her.  In March 2008, Mother told Slife that she was
worried about the level of care that Father would provide and that she thought
Father needed to be in anger management because Ahe had a
temper, he was very controlling, he intimidated her, and it scared her.@  In September 2008, Mother expressed to Slife
that she was very sad Athat she wasn=t going
to be there to protect [Z.D.G.] from [Father]@ and that
she was terrified about the court giving Z.D.G. back to Father.  Father testified that he sued Mother for
custody of Z.D.G. because she started telling lies about him. 

Father
testified, AWhat I am feeling since day one
is that of pure harassment.  Pure
harassment from CPS, when this fight was originally with [Mother] and not with
me.  When they came and took my child, I
made it my fight.@ 
He stated that he did not give CPS any birthday gifts for Z.D.G.=s second
birthday A[b]ecause her gifts are for when
she=s at the
house.  We don=t
celebrate at an enemy=s place.@  With regard to his relationship with CPS from
the beginning, AIt=s been
war.@

Father
testified that he would Anever put [Z.D.G.] in danger in
any way ever knowingly.@ 
With regard to leaving Z.D.G. with Mother, his drug tests, and his lack
of cooperation with CPS, he gave the following testimony during Z.D.G.=s ad
litem attorney=s cross-examination:

Q.  So, then, let me try to summarize what I
believe your answer was in the fact that they [CPS and DFPS] brought this
lawsuit to begin with and have infringed on your rights, your personal rights,
[Father=s] personal rights, and
since they=ve infringed on your
rights and they really haven=t been cooperative with you, you=ve been uncooperative with
them?   

 

A.  That is correct.

 

Q.  That is?  So that=s the principle? 
That=s what you=re trying to validate by
saying no, I=m not going to take a test
is because you violated my rights, you=ve been uncooperative with me and so I=m going to be
uncooperative with you?

 

A.  That=s been the case, yes, sir.

 








Q.  Okay.  And is that more important than your
child?  Is that principle you=re trying to accomplish
more important than [Z.D.G.]?

 

A.  What is important is my
daughter, and like I=ve said, I=ve always done everything
I could in my power for that reason.

 

. . . .

 

Q.  Wouldn=t you agree with me that
taking a hair follicle test or a fingernail test, since you=re clean and you could get
your kid[] back, and although you have this principle of not doing it, that the
reward, that the goal would be justified if [Z.D.G.] were your number one
priority?

 

A.  [Z.D.G.] was taken away from
me because I messed up.  I gave
[Mother] [Z.D.G.], okay?  My drug
tests, Brad, 20 or more from the past, as of recent, speak for themselves.  If I=m doing drugs, I=m sure thoseCin fact, one did come up
positive for hydrocodone, okay?  If I was
trying to mask it or trying to do anything of any kind of sort of way, I=m sure it would have beenCthat would have been
negative, too.

 

Q.  I understand that, [Father],
and I understand yourC 

 

A.  Then why are you asking me to
change my lifestyle?

 

Q.  I=m not.  I=m just saying, when you get the scales and you=re going to weigh the
balance, what=s more important, me
takingCme taking a drug test that
I don=t think I should have to
submit to or getting my little daughter back? 
That=s my question.

 

A.  Brad, as I stated before, this fight has
never been with me; it=s been with my ex, okay?  They made this fight with me.  They are the ones harassing me, asking me why
do I have to grow my hair back?  And I
will do it by court order, no problem, and I have respected that when the judge
has asked me to do that. . . . [Emphasis added.]








There was
also testimony at trial about Father=s
finances and employment.  At the
beginning of the case, Father worked on commission as a personal trainer at a
Gold=s Gym
owned by his brother.  Father then took
on additional part-time work, and later full-time work, sorting mail before
giving up personal training entirely when the recession started affecting his
customers.[22]
In March 2008, Mother told Slife that Father had been fired from his job,[23]
that he asked her for money because he was behind on his rent by a month and a
half, and that he often asked her for money and diapers.  In June 2008, Mother told Slife again that
Father called her seeking financial assistance.

By
September 2008, Father was working for Crown Corr, building Cowboys Stadium; he
testified that he had been promoted to foreman.[24]  Father attributed his eviction to

a couple of disputes over a
couple of bills that [he] had, that really, to sum it up, it was a total
collapse of everything that was occurring for the past couple of months before
that, prior to the actual date of eviction. 
Pretty much falling victimCI=m not a
guy that likes to give excuses, but falling victim to, I guess, today=s recession.








He stated, AThis is
something I know I could have taken care of, but I just couldn=t because
I just didn=t have the funds available.@  Father also admitted that he was in arrears
in his child support for one of his other two children by fifteen months or
more.

Lewis
acknowledged that when Z.D.G. lived with Father, he provided clothes, food, and
a room for her to sleep in, and everything in the home seemed appropriate.  Slife found a toddler bed for Z.D.G. for his
apartment. However, when Z.D.G. returned to foster care, Father failed to
provide her shot records to CPS,[25]
and the last time she went into foster care, Z.D.G. was sick and had to go to
the doctor.

2.  Analysis








In his
first, second, third, and fifth issues and in part of his twelfth issue,[26]
Father contends that the evidence was legally and factually insufficient to
terminate his parental rights on endangerment grounds.  Specifically, he argues that there was no
proof that Z.D.G. was ever in danger when he allowed Mother to have access to
her or that Mother=s conduct ever placed Z.D.G. in
real danger during those occasions.  He
refers to evidence that Mother=s access
to the child was supervised by Grandmother Aduring
one or more of her periods of unsupervised access@ and
complains that no witness was able to tell the jury Aexactly
what danger, if any, the child was actually presented with.@

As noted
above, however, Aendangerment@ means to
expose to loss or injuryCactual loss or injury is not
required to support an endangerment finding. See Boyd, 727 S.W.2d at
533; J.T.G., 121 S.W.3d at 125. 
And Father neglects to account for the endangering environment and
conduct that occurred before Z.D.G.=s birth,
as well as after.  See D.M., 58
S.W.3d at 812; W.A.B., 979 S.W.2d at 806B07; see
also S.K.A., 2009 WL 2645027, at *9. 
That is, the jury heard testimony that Mother used drugsCmethamphetamine,
marijuana, and cocaineCwhile she was pregnant with
Z.D.G.  Dr. Scroggins testified that
cocaine can be fatal to a babyCspecifically,
that it 

can cause abruption of the placenta, separation of the placenta from
the walls of the uterus which ends the baby=s blood supply and can be fatal.  That=s the biggest concern.  We=re also concerned about stunting of the baby=s growth, and we never
know what cocaine may be cut with or what other contaminants may be involved
with it. 

 

The jury could have reasonably
formed a firm belief or conviction that Father knew about Mother=s drug
problem because Mother was pregnant with Z.D.G. and living with him for several
months when she used drugs, because he visited her during her inpatient drug
treatment while she was pregnant with Z.D.G., and because she tested positive
for cocaine on April 30, 2007Cfifteen
days before Z.D.G.=s birth.








Notwithstanding
Mother=s
endangering environment and conduct before Z.D.G. was born, even if Father
believed Mother was no longer using drugs during the six months or so that he
and Mother had possession of Z.D.G., the jury could have reasonably concluded
that when Mother=s January 29, 2008 hair follicle
test resulted positive for cocaine, Father was on notice that Mother=s drug
problem had resurfaced.  And the jury
could have concluded that even if Father was completely unaware of Mother=s and
Grandmother=s drug use up until that pointCin spite
of Mother=s positive January and February
2008 drug tests and Slife=s statement that Father said in
February that he thought Mother must have been using drugs with GrandmotherCby the
time Mother went on a drug binge with Grandmother in May 2008, Father must have
thereafter known of the danger to Z.D.G. of placing her with drug users.  And with regard to the last time that he left
Z.D.G. with Mother, in January 2009, his own testimony that he had given Mother
specific instructions to stay at his apartment because if she took Z.D.G. to
her apartment, she might Ado[] something stupid [like] . .
. drugs,@
acknowledges his awareness of the risk to which he subjected Z.D.G.  The jury could have chosen to disbelieve
Father=s
statement that he would never knowingly put Z.D.G. in danger in any way. 








The jury
had the task of determining which witness to believe with regard to whether
Father knew about Mother=s drug use and whether he knew
her drug use could be dangerous to a toddlerCFather,
who contradicted himself on more than one occasion during his testimony, or the
CPS workers, the CASA worker, Officer Dibley, the toxicologist, and other
witnesses.  See H.R.M., 209 S.W.3d
at 108; see also W.S., 899 S.W.2d at 776.  Based on the entire recordCincluding
the fact that the jury could have interpreted Father=s
repeated refusals to take drug tests for CPS and his head and body hair-shaving
as an indication that he was also using illegal drugsCwe
conclude that the evidence is legally and factually sufficient to uphold
termination of his parental rights on the basis of endangerment.  See Tex. Fam. Code Ann. ' 161.001(1)(D);
J.P.B., 180 S.W.3d at 573; C.H., 89 S.W.3d at 28; cf. Smith
v. Tex. Dep=t of Family & Protective
Servs., Nos. 01-09-00173-CV, 01-09-00390-CV, 2009 WL 4359267, at *8 (Tex.
App.CHouston
[1st Dist.] Dec. 3, 2009, no pet.) (mem. op.) (indicating that a factfinder may
infer from a refusal to take a court‑ordered drug test that parent was
using drugs).  We overrule Father=s first
issue and the part of his twelfth issue addressing endangerment.  Based on our resolution of Father=s first
issue, we need not also address his second, third, and fifth issues. See
Tex. R. App. P. 47.1; In re E.M.N., 221 S.W.3d 815, 821 (Tex. App.CFort
Worth 2007, no pet.). 

C.  Best Interest








In his
fourth issue and part of his twelfth issue, Father argues that the evidence
supporting the jury=s best interest finding is
legally and factually insufficient.  In
his sixth, seventh, eighth, ninth, tenth, and eleventh issues, he attempts to
build upon this argument, contending that DFPS failed to take all steps
reasonably necessary towards the goal of family reunification while he worked
diligently towards achieving that goal, that his own conduct was not dangerous
to Z.D.G., that DFPS=s Ainaction
with regards to providing the CCMS funding for daycare was the proximate cause
of the January 2009 un‑supervised access of . . . [Mother] with the
child,@ and that
he acted with Z.D.G.=s best interest in mind when he
allowed Mother access to her in January 2009.

1.  Standard of Review

There is
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2008).  Among others,
the following factors should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment: the child=s age and
physical and mental vulnerabilities; the frequency and nature of out‑of‑home
placements; the willingness and ability of the child=s family
to seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency=s close
supervision; and whether an adequate social support system consisting of an
extended family and friends is available to the child.  Id. ' 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires of the child;

 








(B)     the emotional and physical needs of the child now and in the
future;

 

(C)     the emotional and physical danger to the child now and in the
future;

 

(D)     the parental abilities of the individuals seeking custody; 

 

(E)     the programs available to assist these individuals to promote
the best interest of the child;

 

(F)     the plans for the child by these individuals or by the agency
seeking custody;

 

(G)     the stability of the home or proposed placement;

 

(H)     the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(I)      any excuse for the acts or omissions of
the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).  


 

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

2.  Analysis








By the
time trial began, Z.D.G. was two years old and had been placed into foster care
four times.  Slife testified that Father
was adamant in refusing family counseling between him and Mother, and his
refusals to CPS=s requests for drug tests and his
general recalcitrance are thoroughly discussed above. Father testified that his
local support system consists of his immediate familyCfather,
brother, and sisterCbut that he has a large extended
family in Chicago.  See Tex. Fam.
Code Ann. ' 263.307(b); R.R.,
209 S.W.3d at 116. He planned to raise Z.D.G. in his family=s
religion, Greek Orthodox.[27]  He also testified that he had been seeing
someone for about four months, that it was Apretty
serious,@ that she
was not a drug user, and that he had never discussed whether she had used drugs
in the past. 

Father
testified that he believed Athe mom
and the dad should raise their children, period.  That=s the way
[he] was brought up, and that=s it.@  He testified he would raise Z.D.G. by
himself, and that if he were to be appointed sole managing conservator, Mother
would not have access to Z.D.G. at all. 
He described his plan for raising Z.D.G. as,








Well, first and absolutely foremost is get her stabilized.  She needs to be attached to her dad, not to
her first foster family, her second foster family.  She needs to be attached to Dad, and once Dad
gets established and all this cloud and rain is gone, then and then, once she
will be grown up, as I was grown up, as roots go deep with me here, she will
have, I plan on her going to college here, I plan on teaching her more country
dance moves.  I used to teach country
dancing, and we did dancing all the time. 
We did our stuff where, your typical dad stuff where you put her on your
back.  What she needs right and foremost,
being two years old, this solidarity, and that=s what I plan on giving
her.

 

He testified that he had two
different babysitters lined up to provide daycare for Z.D.G. and two other
daycares in mind if either of them should fail.

Father
also testified about his two other childrenCa
five-year-old (J.) and a sixteen-year-old (C.). 
He testified that he sees them when he canChe last
saw J. five months before trial.  He does
not have a child support order to pay support for J.  He gave the following testimony on
cross-examination about J. and C.:

Q.  [H]as there been a period of
time in [J.=s] or [C.=s] li[ves] when you have
gone several months with no contact with them, without seeing them in person?

 

A.  Yes, ma=am.

 

Q.  Why is that?

 

A.  Mom would disappear.  Mom goesCshe has, her job consists of going out of town a
lot, so she=s out of town a lot.

 

Q.  Have you filed any motions in
court to get custody of [J.] or [C.]?

 

A.  No, not at the time.  Usually she would let themC 

 

Q.  I mean ever.  Ever.

 

A.  For me to take over rather
than her?

 








Q.  Yeah.  Because she keeps running off with them.  Have you ever filed?

 

A.  We have an understanding.

 

Q.  You have an understanding?

 

A.  Yes, ma=am.

 

Q.  That she can run off with
them for months at a time?

 

A.  Yes, ma=am.

 

Father testified that he sees C.
once a month, and he has been under a court order to pay child support for C.
since 1994.  He admitted that he was in
arrears in his child support for C. by fifteen months or more.

Father testified
that he was educated in automotive technology and, at the time of trial, worked
for Crown Corr, one of the companies involved in constructing Cowboys
Stadium.  Father testified that he had
recently been promoted to foreman at his job, that, although the stadium would
be finished in June, there would still be work there through the preseason, and
that Crown Corr had three or four other projects opening up in the area.  He testified that his union provided insurance,
a pension, and a 401(k), and that he planned to move in with his brother
temporarily until he decides where to build a home. 








Father
had testified that his contingency plans prior to the date of eviction were to
either move in with his brother, who has a five-bedroom house, or to move into
an extended stay hotel.  By the time of
trial, he was still living at Budget Suites. 
He explained,

I=m just
waiting for this whole thing to blow over. 
Once this blows over, I will, like I said, I=m still
entertaining different things I want to do as far as my housing is
concerned.  It=s kind of
hard, as I=ve learned, that once you get an
eviction on your record, it=s kind of
hard to get another apartment.  Actually,
it=s kind of
quite hard, but until everything, I get everything settled with that as far as
Court and then my disagreements with my bills with them, then I have to stay
here temporarily, and I=ve been talking with my brother
extensively here in the past couple of months since [Z.D.G.] has been taken
from me that once all this is gone, I will be moving in with him on a temporary
basis.

Lewis
testified that DFPS=s plans for Z.D.G. were for her
to be adopted by her current foster family. 
Z.D.G.=s foster mother testified that at
the time of trial, Z.D.G. and one other foster child lived with her and her
husband, that they could not have children, and that they became dual-licensed
for foster care and for adoption because they wanted to adopt.  The foster mother testified that she and her
husband wanted to adopt Z.D.G., stating, AWe have a
home for her.  We love her very
much.  She=s very
dear to us, and we would love to have her stay with us.@  Z.D.G.=s foster
mother also gave the following testimony:

Well, I think that we can provide for the basic needs of a growing
toddler.  We can give her a feeling of
being safe and secure.  We=re financially stable, so
if she were to stay with us, she would always know that there would be a home,
a safe place, just family-oriented activities. 
We would be able to provide her with moral and spiritual guidance, basic
needs like a room, clothing, food, unconditional love.  She just would have the support of our
friends and our family members who have already met her and love her.

 








She testified that her husband is
a mechanic for American Eagle, that she has an associate of arts degree and has
been a substitute teacher, and that she currently works part-time doing
accounting and payroll.

Z.D.G.=s foster
mother testified that Early Childhood Intervention (AECI@) came
out three times a month to provide Z.D.G. with therapy to help increase her
vocabulary because A[s]he wasn=t using
very many words whenever she first came into our home, but through the
techniques we=ve been using that ECI has
recommended, she=s probably tripled her vocabulary
at this point, and she=s gone into putting together two-
and three-word sentences.@ 
Father testified that he was never offered ECI services when Z.D.G.
lived with him.








Contrary
to Father=s arguments in his sixth through
eleventh issues, as set out above, the record is replete with Slife=s
descriptions of the assistance that she provided to both parents and CPS=s efforts
to promote family reunification, as well as with testimony about Father=s own
endangering conduct.  Furthermore, the
jury could have chosen to believe Slife=s
testimony about discussing Father=s need to
apply directly for subsidized daycare months in advance, rather than Father=s
testimony that he did not realize that the subsidy would end until it
ended.  Although Father complains that
CPS failed to complete home studies for placement of Z.D.G. with relatives, the
record reflects that home studies were conducted on Father=s brother
and his mother.[28]  The jury was apprised that these home studies
had not been updated since 2007 but also that in September 2008, CPS was still
hoping for family reunification and seeking names from Father for home studies.  And the jury could have believed, based on
the testimony about Mother=s erratic
and dangerous behaviorCmanic behavior, domestic
disturbances, and drug useCthat
Father did not act in Z.D.G.=s best
interest when he allowed Mother access to her in January 2009.

Reviewing
the evidence in the light most favorable to the finding and the judgment, and
assuming the jury resolved any disputed facts in favor of its finding if it
could have reasonably done so, we conclude that the jury could reasonably have
formed a firm conviction or belief that termination of Father=s
parental rights was in Z.D.G.=s best
interest.  See Tex. Fam. Code Ann.
' 161.001(2);
J.P.B., 180 S.W.3d at 573. 
Therefore, we conclude that the evidence is legally sufficient, and we
overrule the remainder of Father=s twelfth
issue.  And in light of the entire
record, we also conclude that the evidence was factually sufficient, and we
overrule Father=s remaining issues.  See Tex. Fam. Code Ann. ' 161.001(2);
H.R.M., 209 S.W.3d at 108. 

III. 
Conclusion








Having
overruled Father=s dispositive issues, we affirm
the trial court=s judgment. 

 

PER
CURIAM

PANEL:  MCCOY and MEIER, JJ.; and
DIXON W. HOLMAN, (Senior Justice, Retired, Sitting by Assigment).

 

DELIVERED: June 10, 2010











[1]See Tex. R. App. P. 47.4.





[2]Mother does not appeal the
termination of her parental rights to Z.D.G.





[3]Although Father also
appears to challenge the sufficiency of the evidence to support termination of
his parental rights under section 161.001(1)(O), his rights were not terminated
on this ground.





[4]Dr. Mark Scroggins, the
obstetrician whose discovery of Mother=s cocaine use via routine labwork led to Z.D.G.=s initial removal,
testified that he first saw Mother five weeks before her due date.  He testified that cocaine can be fatal to a
baby but that Z.D.G. was born healthy.





[5]A CPS worker explained to
the jury the difference between temporary managing conservatorship and
temporary possessory conservatorship as follows:

 

Basically, [DFPS]
maintains custody of the child but we=re placing the child back with parents on a
monitored return just to see how everything is doing and whether or not the
needs of the child are being met.  And
the parents . . . have what we call possessory custody, but we retain the right
to monitor that child inside the home and make sure that she is safe and also
to determine whether or not it=s appropriate . . . for her to remain in the home.





[6]Father was on deferred
adjudication community supervision for a 2003 possession of a controlled
substance offense (cocaine).





[7]The cocaine content of
Mother=s hair from her February
26, 2008 hair follicle testCfor the ninety days between November 2007 and
February 2008Cwas even higher,
suggesting continued and heavy use.





[8]Officer Dibley described
Mother as Avery excited and she could
not sit still.  She could not concentrate
on what I was saying.  She would
continually bounce from topic to topic to topic. . . .  She was fidgeting a lot.  She was asking for water.  She had a really dry mouth.@  Officer Dibley testified that the symptoms of
methamphetamine use are excitability, dry mouth, and foam (Alittle white stuff that
comes right here out of your mouth@) and that Grandmother demonstrated the same symptoms.





[9]According to Lewis, Father
told her that he could not get off from work for the visits during the whole
month of April.





[10]Father is not a parent of
either of these children.





[11]Maples testified that at
one particular visit, Mother Aflew off in a rage@ when Maples tried to stop
the visit because Mother appeared to be about to spank a child.





[12]Officer Dibley testified
that Mother told her that she had signed her two other children over to CPS
because of her methamphetamine use. 





[13]These individuals did not
testify at trial.





[14]The jury also heard that
at the September 17, 2008 hearing, Father said that he let Mother have Z.D.G.





[15]Lewis testified that
daycare is usually set up in three-month increments.





[16]Father described the
events surrounding the offense:

 

One night I was partying
with some friends and we went to this party and there were other people
there.  It had gotten late, and I had
been drinking a few beers, maybe a couple of shots, too, and we had taken off,
and I was in the passenger side, I was letting somebody else drive, and we had
gotten pulled over.  One of the guys I
had met that evening was, I guess, had a warrant for his arrest for some
traffic tickets or whatever I can remember at that time, and they pulled him
out.  They pulled me out, wanted to
search the car.  Go ahead.  Search the car.  I=ve got nothing to hide.  And that=s when they had found a bag of cocaine on my side
of theCbag of cocaine on my side
of the car, and what can I say then?  I
mean, I had to take the blame.

 





[17]Lewis testified that CPS
does not usually have to get a court order to have a parent drug tested because
A[p]arents typically will
comply if they=re clean.@





[18]Fortner, the toxicologist,
testified that, in comparison to hair follicle testing, which shows a
ninety-day history, a urine test is Areally a snapshot in time.@  That is, of all the samples, besides blood
and oral fluids, urine has the shortest windowCAFrom single uses,
generally it=s about 72 hours at best
that we can detect drug use in urine.@





[19]Lewis acknowledged that
CPS had never asked the trial court for an order that Father grow hair to take
a hair follicle test.  Slife acknowledged
that Father had a goatee and that, as far as she knew, no hair follicle sample
had ever been taken from it.  There was
no testimony about whether the goatee contained a sufficient quantity of hairCforty milligramsCfor testing.





[20]Father testified, AThey looked.  They didn=t go into detail, but they pretty much told me to
pull up my pants and my shirt and I offered to go further, but they said no,
that=s okay, they didn=t need me to.@





[21]Slife stated,

 

I allowed [Father] to call
my house whenever he was having trouble with CPS, and he always knew he could
call and vent, and he did that often when he was very frustrated.  He would be very upset, and as long as it
wasn=t directed at me, it didn=t bother me, so I let him
call.  I talked to him numerous times
about how [Mother] was doing, thought it was important that he understand her
emotional state and some of the drug tests so that he would know that she wasn=t doing as well as he
thought.

 





[22]Father stated,

 

My hours of sleep . . .
was six in the morning until about 11 o= clock in the morning where I would start working
at Gold=s Gym from about 11 until
about eight or nine, and then . . . when I worked nights from 12 till about
eight in the morning, sleep from eight in the morning until about 11, and then
I would work almost full-time.  I started
full-time with them from about 12 o=clock until seven.





[23]Father testified that he Apretty much quit@ after working two
full-time jobs for around four months.





[24]Lewis testified that
parents have the responsibility to provide CPS with documentation of income and
employment and that, although she had requested pay stubs from Father numerous
times, he never provided any and she was unable to verify his employment.





[25]Slife testified that
Father did not keep up with Z.D.G.=s immunizationsCZ.D.G.=s fifteen-month shot was due when Father had
possession and Slife brought him the WIC card and Medicaid information from the
foster home so that he could get it taken care of.





[26]Father challenges the
denial of his motion for directed verdict, which is a legal sufficiency
challenge.





[27]Cumberbatch stated that
when she placed Z.D.G. with Father and Mother, neither told her anything about
any religious observances that they wanted DFPS to consider and that this was
not brought up at any point while Z.D.G. was in foster care.

 

Father testified that Z.D.G.=s hair was cut without his permission, that the
first time a Greek Orthodox child=s hair is cut is when she is first baptized, and
that he told the CPS worker Aspecifically what herCwhat she could and could
not do, and especially the hair.@  He stated
that  he Aasked CPS and everybody
and to whom it may concern, [and] that strictly what I wanted for [Z.D.G.] was
not even mentioned to [the foster parents] is disturbing and it=s shocking, and I feel
violated because of that.@  Lewis testified that Z.D.G.=s hair was cut with Mother=s permission.





[28]CPS determined that Father=s brother would not be
able to provide care for Z.D.G. because of the hours that he worked.  Lewis testified that Arizona CPS and Texas
CPS denied Father=s mother Abecause there were
allegations of sexual molestation of [Father=s] sister by the stepfather.@  Lewis testified that she was not aware of
whether the stepfather still lived with Father=s mother.